**Mary B. ALLEN, a/k/a Mary Beth Stenzel, Plaintiff–Appellant,**

v.

**William S. MARTIN; Kutak Rock L.L.P.; Paul G. Bursiek; and Pendleton Friedberg Wilson & Hennessey, P.C., Defendants–Appellees.**

**No. 06CA1768.**

Colorado Court of Appeals,
Div. VI.

June 12, 2008.

Charles Welton, P.C., Charles Welton, Denver, Colorado; Doug Meier, Lakewood, Colorado, for Plaintiff–Appellant.

Haddon Morgan Mueller Jordan Mackey & Foreman, P.C., Jeffrey S. Pagliuca, Denver, Colorado; Wheeler Trigg Kennedy L.L.P., Michael L. O'Donnell, Carolyn J. Fairless, Jessica G. Simbalenko, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge WEBB.

In this legal malpractice action, plaintiff, Mary Beth Allen, appeals the summary judgment in favor of defendants, William S. Martin, Paul G. Bursiek, Kutak Rock, L.L.P., and Pendleton Friedberg Wilson & Hennessey, P.C., and the trial court's order striking her criminal law expert. We affirm.

### Synopsis

We first discuss whether malpractice claims are compulsory counterclaims in an action to collect legal fees, and conclude that C.R.C.P. 13(a) bars all of Allen's claims against Bursiek, Pendleton, and Martin for his conduct while at Pendleton. The remainder of the opinion addresses Martin's conduct while at Kutak, for which it could be vicariously liable.

We next examine whether a guilty plea is preclusive in subsequent civil litigation and conclude that Allen's guilty plea estops her from relitigating any facts necessarily established by the plea. However, it is not preclusive on the "in connection with" a security element of criminal securities fraud, which does not require proof of specific intent.

Nevertheless, Martin's failure to have made rescission offers to participating buyers does not establish the negligence claim because such offers would have been irrelevant to Allen's culpability for having already committed securities fraud. Negligent securities advice by Martin that supposedly "led to" to the Ryan charge is not actionable because Allen's plea admitted having acted knowingly on all elements of this charge.

We then turn to the breach of fiduciary duty claim, and conclude that expert testimony is required for both Martin's alleged obligation to have discussed his representation of Allen with the prosecutor and the purported effect such a discussion would have had on the criminal proceedings. We uphold the trial court's ruling striking the criminal law expert, which precludes this claim.

Thus, the summary judgment is affirmed.

I. Introduction .................................................. ——
 A. Facts ..................................................... ——
 B. Allen's Theory of the Case ................................ ——
 C. The Trial Court's Ruling ................................. ——
II. Summary Judgment Standard ..................................... ——
III. C.R.C.P. 13(a) ................................................ ——
 A. Capacity ................................................. ——
 B. Logical Relationship ..................................... ——
 C. Maturity of Compulsory Counterclaim ...................... ——
 D. Opposing Parties ........................................ ——
IV. Allen's Guilty Plea and Causation ............................. ——
 A. Issue Preclusion ........................................ ——
 1. Colorado Precedent ................................... ——
 2. Out-of-State Authority ............................... ——
 3. Policy Considerations ................................ ——
 B. Causation .............................................. ——
 1. Setting Aside a Criminal Conviction .................. ——
 2. The Negligence Claim ................................. ——
 3. The Breach of Fiduciary Duty Claim ................... ——
 4. The Criminal Law Expert .............................. ——

## I. Introduction

### A. Facts

Many of the facts in this case are disputed. The record establishes the following facts as either undisputed or necessarily resolved in favor of Allen for purposes of this appeal.

Allen was an officer and minority shareholder of Women's International Investment Network (WIIN). WIIN purchased residential properties, which it resold to "participating buyers" in noncash transactions partly funded by a promissory note from WIIN. A participating buyer would obtain a loan to finance the remainder of the purchase price, lease the property back to WIIN, and plan to service the loan with rent collected by WIIN on its sublease of the property until the property could be sold at a profit to be divided between WIIN and the participating buyer. *See People v. Destro*, —— P.3d ——, ——, 2008 WL 2202099, *1 (Colo.App. No. 03CA1261, May 29, 2008) (affirming conviction of one of the WIIN principals on charges arising from WIIN's failure to perform its obligations to participating buyers).

In 1998, WIIN entered into a fee agreement with the Pendleton firm. Allen guaranteed payment. In August 2000, Pendleton terminated its representation of WIIN for nonpayment of fees. During this time, both Bursiek and Martin were with Pendleton, and they provided advice concerning the securities law implications of the participating buyers program.

In April or May 2000, the district attorney began investigating WIIN. Neither Bursiek nor Martin ever spoke to the prosecutor about their representation of Allen. In October 2000, Martin left Pendleton and joined the Kutak firm. In November 2000, Kutak began representing WIIN and Allen in various civil matters, including complaints against her filed with the real estate commission. Martin also performed some services in connection with loans to WIIN from a third party who had not been a participating buyer (the Ryan transaction).

On September 12, 2001, Pendleton sued WIIN, Allen, and others for its fees (the collection action). Allen was served with the summons and complaint on October 2, 2001, but failed to respond, and Pendleton obtained a default judgment against her.

Meanwhile, on August 22, 2001, Allen and the other WIIN principals were indicted on multiple counts of securities fraud and theft arising from transactions with participating buyers. In 2002, they were indicted for theft and conspiracy involving the Ryan transaction.

In August 2003, Allen agreed to plead guilty to one count of securities fraud in violation of sections 11–51–501(1)(c) and 11–51–603(1), C.R.S.2007, concerning the most

recent of the previously charged participating buyers transactions, and one count of theft in violation of section 18–4–401(1), (2)(d), C.R.S.2007, concerning the Ryan transaction. Based on the plea agreement, judgment of conviction was entered and Allen was sentenced. She has not sought to set aside her plea.

### B. Allen's Theory of the Case

According to Allen, she had an attorney-client relationship with all defendants and relied on them for advice, including securities issues arising from the participating buyers program. As relevant here, she asserted negligence and breach of fiduciary duty.

The negligence claim alleged that defendants acted below the standard of care by failing to warn her that WIIN's activities could violate the securities laws, to caution her as to potential criminal liability, to make the participating buyers program securities law compliant, and to remedy possible past securities law violations by offering participating buyers rescission based on additional disclosures before she was indicted. Allen asserts that noncompliance with the securities laws led to prosecution of the Ryan charges, but she does not identify any deficiencies in the legal services performed on the Ryan transaction by Martin while he was with Kutak.

The breach of fiduciary duty claim alleged that Bursiek and Martin did not assist her in defense of the criminal securities fraud charges by acknowledging to the prosecutor their supposed approval of the participating buyers program. The amended complaint did not specifically include the Ryan transaction in her breach of fiduciary duty claim. According to Allen's criminal law expert, however, Martin should have told the prosecutor that the Ryan transaction involved no intentional wrongdoing.

### C. The Trial Court's Ruling

After the parties had engaged in extensive discovery and exchanged summaries of anticipated expert testimony, Pendleton moved for summary judgment. Kutak joined in that motion and filed its own summary judgment motion. While these motions were pending, the trial court held an evidentiary hearing and struck Allen's criminal law expert. Thereafter, in a detailed written order, the trial court granted Pendleton's motion on three grounds, without mentioning Kutak's motion. The court did not specifically rely on its ruling striking the expert.

First, the court held that Allen's claims should have been brought in the collection action as compulsory counterclaims under C.R.C.P. 13(a), and therefore were barred as against Pendleton, and Bursiek and Martin because they were in privity with Pendleton. In this aspect of its ruling, the court acknowledged that Kutak was not in privity, but it did not address Martin's conduct while he was at Kutak.

Second, treating Allen's guilty plea as conclusively establishing that she had committed securities fraud and theft, the court held that the *in pari delicto* doctrine barred Allen's claims against Pendleton, Bursiek, and Martin because Allen's "theory of the case is that the Pendleton Defendants participated in the illegal and fraudulent conduct to which she pled guilty." Again, the court did not address Martin's conduct while he was at Kutak.

Third, the court held that Allen could not prove causation because she had "committed two *malum in se* crimes," and therefore "no reasonable jury could conclude that [Allen] would not have committed theft and securities fraud but for the Pendleton Defendants' acts or omissions." The court then briefly noted the negligent misrepresentation claim and added that this conclusion "applied to [Allen's] claims against all Defendants." It did not mention Kutak's motion. Because none of the parties offers any separate argument concerning the negligent misrepresentation claim on appeal, we will treat it as subsumed in our rulings.

### II. Summary Judgment Standard

We review the grant of summary judgment de novo. *Timm v. Reitz,* 39 P.3d 1252, 1255 (Colo.App.2001).

Summary judgment is a drastic remedy, and is not a substitute for a trial of disputed facts. *Kaiser Found. Health Plan v. Sharp,*

741 P.2d 714, 718 (Colo.1987). It is appropriate only if the pleadings and supporting documents demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Timm*, 39 P.3d at 1255. The moving party has the burden to establish that no such issue exists, and any doubts must be resolved against that party. *Id.* The nonmoving party is also entitled to the benefit of all favorable inferences that may reasonably be drawn from any undisputed facts. *Id.*

Once the moving party shows the absence of genuine issues of material fact, the nonmoving party must demonstrate with relevant and specific facts that a real controversy exists. *Westerman v. Rogers*, 1 P.3d 228, 230 (Colo.App.1999). The nonmoving party may not rest on mere allegations or denials in its pleadings, but must provide specific facts demonstrating the existence of a genuine issue for trial. *Id.*

### III. C.R.C.P. 13(a)

Allen first contends the trial court erred by concluding that except as against Kutak, her claims were barred because they should have been raised as compulsory counterclaims in the collection action. We agree only to the extent that claims against Martin for conduct after he left Pendleton and joined Kutak also are not barred by the compulsory counterclaim rule.

■ We review a trial court's determination that a claim is a compulsory counterclaim de novo. *Grynberg v. Phillips*, 148 P.3d 446, 447 (Colo.App.2006).

C.R.C.P. 13(a) provides in relevant part:

A pleading shall state as a counterclaim any claim which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

■ The purpose of C.R.C.P. 13(a) is to prevent a multiplicity of lawsuits arising from one set of circumstances. *Grynberg*, 148 P.3d at 449. A party who fails to plead a claim properly classified as a compulsory counterclaim is barred from raising that claim in a later action against a person who was a plaintiff or in privity with a plaintiff in the prior action. *Id.* at 448.

### A. Capacity

■ We decline to address Allen's argument that her claims were not compulsory counterclaims because she could have counterclaimed against Pendleton only in her capacity as a former client, but she was sued solely in her capacity as a guarantor of the attorney fees owed by WIIN.

Allen does not cite to anywhere in the record that she made this argument to the trial court. We are not persuaded that she did so by her reference to various Pendleton court filings that mention her having been sued on the guarantee. *Cf. Minto v. Lambert*, 870 P.2d 572, 575 (Colo.App.1993) (even if raised in the pleadings, an issue should be brought to the trial court's attention for ruling before it can be claimed as error on appeal).

Therefore, we decline to address her capacity argument on appeal. *See Fifth Third Bank v. Jones*, 168 P.3d 1, 5 (Colo.App.2007) (an argument not presented to the trial court cannot be raised for the first time on appeal); *but see Roberts v. Am. Fam. Mut. Ins. Co.*, 144 P.3d 546, 550 (Colo.2006)(on review of summary judgment, appellate court has discretion to consider argument not raised below).

### B. Logical Relationship

■ Allen next asserts that her claims are exempt from C.R.C.P. 13(a) because they are not logically related to the collection action, which she argues was based on her personal guarantee and not on the provision of legal services. We disagree as to Bursiek, Pendleton, and Martin for conduct while he was at Pendleton.

■ A counterclaim is compulsory if it arises out of the same transaction or occurrence as the opposing party's claim. *In re Estate of Krotiuk*, 12 P.3d 302, 304 (Colo. App.2000). The accepted method for deter-

mining whether a claim arises out of the same transaction or occurrence as the first claim is the logical relationship test: whether the subject matter of the counterclaim is logically related to the subject matter of the initial claim. *Id.* This test is a "broad, flexible, and practical standard, which prevents the filing of a multiplicity of actions and encourages the resolution of all disputes arising out of a common factual matrix in a single lawsuit." *McCabe v. United Bank,* 657 P.2d 976, 978 (Colo.App.1982).

The complaint in the collection action alleged that (1) Allen "signed a written agreement on WIIN's behalf pursuant to which WIIN retained [Pendleton] to represent WIIN in certain matters pertaining to a real estate investment program"; (2) "Allen agreed to pay all fees unpaid by [WIIN]"; (3) Pendleton "performed all services required by the Agreement as a prerequisite to payment" of its fees; and (4) WIIN and Allen "failed to pay the sums due and owing" to Pendleton.

As relevant to the logical relationship test, the amended complaint in this action alleged that (1) Pendleton "undertook legal representation of WIIN ... including Allen ... regarding the legality and propriety of its business methods"; (2) she relied on Pendleton "to assure that the WIIN entity was operated within the requirements of the securities laws ... to protect her from any potential violations of the law"; and (3) Pendleton failed to advise and direct her as to exemption from and compliance with securities laws.

Thus, this action and the collection action both relate to Pendleton's representation of WIIN and its fee agreement with WIIN. *See* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1410 (2008)("When the same contract serves as the basis for both the claims and the counterclaims, the logical relationship standard also has been satisfied."); *Visual Factor, Inc. v. Sinclair,* 166 Colo. 22, 26, 441 P.2d 643, 645 (1968) (employee's wage claim and employer's fraud claim "arose out of the same transaction, i.e., the contract of employment, and each is a compulsory counterclaim to the other"); *McCabe,* 657 P.2d at 978 (bank's suit to collect on promissory note and borrower's lender liability claim arose out of the same credit transaction). Hence, we conclude that the claims in these two actions have a logical relationship.

Other jurisdictions have used this test in concluding that a legal malpractice claim arising from the same representation as an action to collect attorney fees is a compulsory counterclaim in the fees action. *See Law Offices of Jerris Leonard, P.C. v. Mideast Sys., Ltd.,* 111 F.R.D. 359, 361 (D.D.C. 1986)("[I]t is hard to imagine a clearer compulsory counterclaim to a complaint for failure to pay legal fees than a legal malpractice claim stemming from the handling of the litigation for which fees are sought."); *B.J. Howard Corp. v. Skinner, Wilson, Strickland, Hardy & Benson,* 172 Ga.App. 446, 323 S.E.2d 664, 665 (1984); *Purmal v. Robert N. Wadington & Assocs.,* 354 Ill.App.3d 715, 289 Ill.Dec. 578, 820 N.E.2d 86, 95 (2004); *Brunacini v. Kavanagh,* 117 N.M. 122, 869 P.2d 821, 829 (Ct.App.1993); *Goggin v. Grimes,* 969 S.W.2d 135, 138 (Tex.App.1998). We consider these cases well reasoned and note that Allen cites no contrary authority.

■ We are not persuaded otherwise by Allen's argument that the collection action "would likely take an hour—or perhaps two—to litigate ... [and] there would likely be no depositions or other discovery," while evidence in her legal malpractice action would be very complex. "A counterclaim may be compulsory if it arises from the same events as the prior claim, even though the evidence needed to establish each claim may be different." *Grynberg v. Rocky Mountain Natural Gas,* 809 P.2d 1091, 1093 (Colo.App. 1991); *see McCabe,* 657 P.2d at 978 ("A logical relationship exists when the counterclaim arises from the same 'aggregate of operative facts' as the opposing party's claim." (quoting *Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co.,* 426 F.2d 709 (5th Cir.1970))).

■ Contrary to Allen's assertion, both the collection action and this action would involve proof of legal services rendered while Bursiek and Martin were at Pendleton, including services involving securities law is-

sues. Further, an attorney's negligence is a defense to that attorney's claim for fees. *McCafferty v. Musat*, 817 P.2d 1039, 1045 (Colo.App.1990); *see also Jerris Leonard*, 111 F.R.D. at 361 ("The party raising the malpractice claim is in effect asserting a defense of failure to perform to the lawyer's claim for breach of contract.").

Therefore, we conclude that the logical relationship test has been met as to Bursiek, Pendleton, and Martin for conduct while he was at Pendleton.

C. Maturity of Compulsory Counterclaim

■■■ Alternatively, Allen asserts that even if her claims were logically related to the collection action, whether those claims had matured as of her deadline to answer in that action was a factual issue that could not be decided by summary judgment. Again, we disagree as to Bursiek, Pendleton, and Martin for conduct while he was at Pendleton.

On appeal, all parties urge that maturity be determined by applying the discovery rule, although the trial court expressly declined to do so and instead held that Allen's claims were not contingent when her answer came due in the collection action. The parties cite no Colorado case, and we have found none, applying the discovery rule to determine maturity under C.R.C.P. 13(a). Because C.R.C.P. 13(a) is substantially similar to Fed.R.Civ.P. 13(a), we may look to federal precedent for guidance. *Krotiuk*, 12 P.3d at 305.

■■■ Under C.R.C.P. 13(a), a party need not assert a counterclaim unless it has matured at the time of the responsive pleading, even if it arises from the same transaction or occurrence described in the complaint. *Id.* This exception derives from language in the rule limiting its application to claims the pleader has "at the time of filing the pleading." C.R.C.P. 13(a); *see Krotiuk*, 12 P.3d at 305 ("the claim is one which the claimant could have maintained"); *see also* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1411.

■■■ A counterclaim that is contingent has not matured for purposes of the compulsory counterclaim rule. *See, e.g., Blaser v. Cameron*, 116 Idaho 453, 776 P.2d 462, 465 (App.1989)(contractor's claim was not a compulsory counterclaim in an earlier action because contractor did not have a legal basis for his claim until he had completed his promised performance under the contract); *Steinberg v. St. Paul Mercury Ins. Co.*, 108 F.R.D. 355, 358 (S.D.Ga.1985)(because insurer's answer in prior case was filed at least three months before a security deed and promissory note had been assigned to insurer, its counterclaim based on the deed and note may have been anticipated, but it had not matured).

Here, like the trial court, we discern no similar contingency that would have precluded Allen from bringing her claims when she should have answered in the collection action. Nevertheless, we also consider the discovery rule because the absence of any such contingency does not inform us whether Allen knew or reasonably should have known of her claims when her answer came due in the collection action.

■■■ To establish negligence in a legal malpractice case, a client must prove that (1) the attorney owed a duty of care to the client; (2) the attorney breached that duty; and (3) the breach proximately caused damage to the client. *Stone v. Satriana*, 41 P.3d 705, 712 (Colo.2002).

■■■ For statute of limitations purposes, a legal malpractice claim accrues "when the client discovers, or through use of reasonable diligence should have discovered, the negligent conduct and damage." *Morrison v. Goff*, 74 P.3d 409, 411 (Colo.App.2003), *aff'd*, 91 P.3d 1050 (Colo.2004). This test focuses on the client's knowledge of facts that would put a reasonable person on notice of the general nature of the damage and that the damage was caused by the wrongful conduct of the attorney. *Id.* While normally a question of fact, if undisputed evidence shows that the client discovered or should have discovered the negligent conduct and damage as of a particular date, the issue may be decided as a matter of law. *Broker House*

*Int'l, Ltd. v. Bendelow,* 952 P.2d 860, 863 (Colo.App.1998).

Several courts have applied the discovery rule in deciding whether a negligence claim was a compulsory counterclaim. In *Jerris Leonard,* 111 F.R.D. at 361, attorneys sought a declaratory judgment that a former client's legal malpractice action pending in another court was barred because it should have been raised as a compulsory counterclaim in their prior action against that client to collect attorney fees. The court agreed, explaining:

> When [the client] was sued for nonpayment of legal fees ... [he] was put on notice that the reasonableness of the fees charged would be an issue. In light of [his] suspicions about the quality of the legal services rendered, [the client] should have discovered then that the lawyers' work might have been actionably negligent. Instead, [the client] chose not to appear and suffer a default judgment. Thus, the Court finds that [the client's] legal malpractice claim ... accrued ... at the latest, when an answer was due from [the client] in the [unpaid fees] litigation. By that time, [the client] should have known, or should have diligently taken steps to discover, the existence of a legal malpractice claim.

111 F.R.D. at 363; *see also Andrews v. Wade & De Young, Inc., P.C.,* 875 P.2d 89, 91 (Alaska 1994)("A cause of action for attorney malpractice does not mature [under Alaska Civil Rule 13(a) ] until 'the client discovers or reasonably should have discovered the existence of all the elements of his cause of action.' " (quoting *Wettanen v. Cowper,* 749 P.2d 362, 364 (Alaska 1988))); *Brunacini,* 869 P.2d at 826 (a cause of action for legal malpractice is deemed to have matured for purposes of the compulsory counterclaim rule when the statute of limitations for legal malpractice begins to run). We approve of the reasoning in these cases.

■ Moreover, applying the discovery rule in resolving maturity under C.R.C.P. 13(a) tempers the harshness of having a claim forever barred by considering what a reasonable person should have known about the claim at the time of the prior action. *See Jerris Leonard,* 111 F.R.D. at 362–63.

Hence, we conclude that maturity of a noncontingent claim should be measured by the discovery rule, and we apply it as follows.

Because Pendleton ceased representing Allen and WIIN in August 2000, and Allen was indicted in August 2001, its attorneys' conduct that forms the basis of the negligence claim necessarily occurred before the collection action was filed in September 2001. Because the indictment included multiple counts of securities fraud, when her answer in the collection action came due two months later she knew or reasonably should have known that the criminal charges treated the participating buyers program as involving the purchase or sale of a security, and that such treatment was directly contrary to the advice which her negligence claim alleges Pendleton's attorneys gave to her.

■ Further, "an injury is different from the damages that flow from the injury.... [D]amages do not need to be known before accrual of a claim." *Brodeur v. Amer. Home Assur. Co.,* 169 P.3d 139, 147 fn. 8 (Colo. 2007). Here, the wrong is legal advice below the standard of care and the injury is Allen's indictment, both of which preceded the deadline for Allen to answer. Hence, we need not resolve when she suffered the damages alleged in the amended complaint, including harm to Allen's professional reputation as a real estate broker, loss of income, diminished earning capacity, expenses incurred to defend the criminal charges, and emotional distress.

Therefore, we conclude that under the discovery rule Allen's negligence claim against Bursiek, Pendleton, and Martin for his conduct while at Pendleton had matured when she was required to answer in the collection action.

Nevertheless, Allen asserts that her breach of fiduciary duty claim did not accrue and thus was not mature under C.R.C.P. 13(a) until she pled guilty in 2003. As to Bursiek and Pendleton, we are not persuaded.

The amended complaint alleges that Martin and Bursiek breached their fiduciary duty by:

[N]ot coming to the aid of Allen when she faced criminal charges. Instead of aiding Allen and acknowledging that they were responsible for Allen being charged with securities violations, [they] allowed Allen to incur the consequences instead of themselves facing such consequences.

This theory does not depend on the existence of an attorney-client relationship at the time of the alleged breach. *See, e.g.,* D. Horan & G. Spellmire, *Attorney Malpractice: Prevention and Defense* § 16–2 (1986)("[T]he attorney's fiduciary duties do not terminate with the termination of the attorney-client relationship."); *see also* Colo. RPC 1.16(d).

▋ Regardless, undisputed facts sufficient to put Allen on notice of this alleged breach existed before October 22, 2001, as to Bursiek and Pendleton. Having been indicted on securities fraud charges two months earlier and having been sued for fees by Pendleton one month earlier, a reasonable person in Allen's position would have recognized that Bursiek had not come to her aid by acknowledging his alleged responsibility. Such a person would also have recognized that Bursiek was not likely to do so, because Pendleton had taken an adverse position to Allen in the collection action and acknowledging his alleged responsibility would be contrary to his interests. Further, Allen does not point to any conduct by Bursiek during the sixty days between the indictment and answer date suggesting he might do so. Thus, in the exercise of reasonable diligence Allen should have also recognized that she had a claim under her breach of fiduciary duty theory against Bursiek and Pendleton.

▋ In contrast, Allen's continued representation by Martin after he joined Kutak in October 2000 creates a fact issue precluding summary judgment as to the breach of fiduciary duty claim for not coming to her aid from that time until she pled guilty. We recognize that Colorado has not adopted the rule that continuous representation tolls the statute of limitations until the representation ends. *Bendelow,* 952 P.2d at 864. Nevertheless, for purposes of the discovery rule, because of Martin's continuing representation Allen could reasonably have expected him to come to her aid, as alleged in the amended complaint, even after her answer came due in October 2001.

Therefore, we conclude that Allen's negligence claim as to Bursiek, Martin, and Pendleton, and her breach of fiduciary duty claim as to Bursiek and Pendleton, were mature by October 22, 2001.

### D. Opposing Parties

Allen finally asserts that even if her claims were matured compulsory counterclaims, Martin and Bursiek were not "opposing parties" under C.R.C.P. 13(a). We agree only as to Martin concerning his conduct after joining Kutak.

▋ "Privity exists when there is a substantial identity of interests between a party and a non-party such that the non-party is virtually represented in litigation." *Argus Real Estate, Inc. v. E–470 Pub. Highway Auth.,* 97 P.3d 215, 217 (Colo.App.2003) (quoting *People in Interest of M.C.,* 895 P.2d 1098, 1100 (Colo.App.1994)), *aff'd,* 109 P.3d 604 (Colo.2005).

▋ An individual attorney is in privity with the attorney's law firm. *Purmal,* 289 Ill.Dec. 578, 820 N.E.2d at 94–95; *Brunacini,* 869 P.2d at 825. We consider the privity analysis in these cases to be well reasoned and adopt it here. Allen cites no contrary authority.

▋ The amended complaint alleged that "[t]he Pendleton firm is vicariously liable for the acts and omissions of its agents, Martin and Bursiek, who at all times pertinent to this Complaint were acting within the course and scope of their employment while employed with the Pendleton firm." These allegations alone show a substantial identity of interests between Pendleton, on the one hand, and Martin and Bursiek, on the other hand, concerning the propriety of their conduct while at Pendleton.

Hence, we agree with the trial court that as to the conduct at issue in Allen's claims performed while Martin and Bursiek were at Pendleton, privity existed, and thus C.R.C.P. 13(a) bars Allen's claims against them based on that conduct. *See Purmal,* 289 Ill.Dec.

578, 820 N.E.2d at 94–95; *Brunacini,* 869 P.2d at 825.

We also agree with the trial court's conclusion that because Kutak "cannot be considered an 'opposing party'" in the collection action, Allen's claims against Kutak are not barred by C.R.C.P. 13(a). For the same reason, we conclude that as to Martin's conduct while at Kutak, he was not in privity and C.R.C.P. 13(a) does not bar Allen's claims against him to the extent of that conduct, an issue on which the trial court's decision is unclear.

Kutak's and Martin's reliance on *Purmal* and *Pomfret Farms Limited Partnership v. Pomfret Associates,* 174 Vt. 280, 811 A.2d 655 (2002), for their assertion that C.R.C.P. 13(a) bars Allen's claims against them is misplaced. Neither case addresses the scenario here of an attorney in privity with one law firm who leaves that firm and is potentially liable for later conduct with a second firm. *See Purmal,* 289 Ill.Dec. 578, 820 N.E.2d at 94–95 (individual attorney was in privity with law firm where attorney was an employee); *cf. Pomfret,* 811 A.2d at 660 (for purposes of the compulsory counterclaim rule, individual partners of partnership were in privity with partnership).

In sum, we conclude that Allen's claims are barred under C.R.C.P. 13(a) as against Bursiek and Martin for conduct while they were employed at Pendleton and as against Pendleton, but not as against Martin for conduct while he was employed at Kutak or as against Kutak based on vicarious liability for Martin's conduct.

## IV. Allen's Guilty Plea and Causation

Allen next contends the trial court erred in holding that under the doctrine of issue preclusion her guilty plea conclusively established she had committed securities fraud and theft, and therefore its rulings on *in pari delicto* and causation must be set aside. Because we have held that her claims against Pendleton, Bursiek, and Martin for his conduct while at Pendleton are barred by C.R.C.P. 13(a), and the trial court did not rule on *in pari delicto* as to Kutak, we consider this contention only as to the ruling in favor of Kutak and Martin on causation.

As so limited, we agree with the trial court that the guilty plea was preclusive, but we resolve causation in favor of Kutak and Martin using a different analysis than did the trial court.

## A. Issue Preclusion

Issue preclusion is a judicially created, equitable doctrine intended to "relieve parties of multiple lawsuits, conserve judicial resources, and promote reliance on the judicial system by preventing inconsistent decisions." *In re Tonko,* 154 P.3d 397, 405 (Colo. 2007) (quoting *Sunny Acres Villa, Inc. v. Cooper,* 25 P.3d 44, 47 (Colo.2001)).

Issue preclusion bars relitigation of an issue decided in a prior proceeding when (1) the issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel is sought was a party to or was in privity with a party to the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding. *In re Water Rights of Elk Dance Colo., LLC,* 139 P.3d 660, 667 (Colo.2006). The burden of establishing these elements rests with the party seeking preclusion. *Bebo Constr. Co. v. Mattox & O'Brien, P. C.,* 990 P.2d 78, 85 (Colo.1999).

Allen disputes that the first and fourth elements of issue preclusion were satisfied by her plea because, she asserts, whether she committed securities fraud and theft was not actually litigated, and once she accepted the plea agreement she no longer had a full and fair opportunity to litigate the issue. We are not persuaded.

We begin with the fourth element, which has been more clearly addressed in Colorado. Factors relevant in determining a full and fair opportunity to litigate are (1) whether the procedures in the earlier action differ substantially from procedures in the action where preclusion is sought; (2) whether the party resisting preclusion had sufficient incentive to vigorously litigate the issue

in the earlier action; and (3) whether the issues in the second action are similar to that issue. *Elk Dance,* 139 P.3d at 669.

 The first and second factors have been decided adversely to Allen's position. *A–1 Auto Repair & Detail, Inc. v. Bilunas–Hardy,* 93 P.3d 598, 603 (Colo.App.2004) ("[t]he remedies and procedures in a criminal case are substantially more stringent than those in a civil case," and the liberty interest at stake creates an "incentive to fully litigate and defend").

Although the party precluded in *Elk Dance* had defaulted, the supreme court discerned no loss of opportunity, explaining that the party "chose not to litigate." 139 P.3d at 669. The same is true of Allen's guilty plea.

As explained in subsection B below, for purposes of causation the factual admissions in Allen's guilty plea are inextricably intertwined with the consequences of Martin's alleged negligence and breach of fiduciary duty. Hence, we conclude that the fourth element of issue preclusion has been met.

The first element—what is actually litigated in a guilty plea—presents a much closer question. In connection with her Crim. P. 11 advisement, Allen acknowledged in writing that:

> 6. The decision to plead guilty is my decision, and it has been made freely and voluntarily. There has been no threat, coercion, undue influence or force used to make me plead guilty. I know that I do not have to follow my attorney's advice and that I do not have to plead guilty.
>
> 7. I know that a plea of guilty admits the charge and a plea of not guilty denies the charge. I admit that there are sufficient facts in this case which could be presented at trial and which would result in a strong likelihood of a conviction of this charge. . . .

According to Martin and Kutak, because Allen admitted a factual basis for the charges, "a determination on that issue was necessary to the judgment," *Elk Dance,* 139 P.3d at 667, and thus occurred upon her conviction. However, that language in *Elk Dance* is not dispositive of the "actually litigated" element because it turned on a default judgment in a civil matter, not a guilty plea in a criminal case.

Moreover, the parties acknowledge that whether a guilty plea is preclusive in a subsequent civil proceeding on issues admitted by the plea remains unresolved in Colorado. *See Jiron v. City of Lakewood,* 392 F.3d 410, 416 (10th Cir.2004); *cf. McCormick v. United States,* 539 F.Supp. 1179, 1183 (D.Colo. 1982). Hence, we examine in turn Colorado cases that suggest preclusion, analogous cases from other jurisdictions, and underlying policy considerations.

### 1. Colorado Precedent

*Jiron* held that "the courts of Colorado would accord preclusive effect to a guilty plea in a subsequent civil proceeding," 392 F.3d at 416, rather than merely treating it as an admission of the defendant. *Jiron* thereby impliedly overruled the contrary holding in *McCormick,* on which Allen relies. Although in matters of Colorado law we are not bound by decisions of the federal courts, *People v. Eppens,* 979 P.2d 14, 19 (Colo.1999) and *Hill v. Thomas,* 973 P.2d 1246, 1255 (Colo.1999), we begin by examining the *Jiron* court's rationale, which the trial court adopted here.

*Jiron* cited *People ex rel. Attorney General v. Edison,* 100 Colo. 574, 69 P.2d 246 (1937), and *Jones v. District Court,* 196 Colo. 261, 584 P.2d 81 (1978), both of which distinguish guilty pleas from nolo contendere pleas. 392 F.3d at 416. The *Edison* court said: "The difference between [a plea of nolo contendere] and a plea of guilty appears simply to be that, while the latter is a confession binding defendant in other proceedings, the former has no effect beyond that particular case." 100 Colo. at 577, 69 P.2d at 248 (quoting 16 C.J. 404 § 739). Similarly, the *Jones* court said: "Generally a plea of Nolo contendere is equivalent to a guilty plea only for the purposes of that criminal proceeding. [It] cannot be relied upon as an admission of the facts underlying the plea in any civil suit arising out of the same act." 196 Colo. at 264, 584 P.2d at 83 (citation omitted).

Since *Jiron,* our supreme court has reiterated that "[t]he sole distinction we have made between a guilty plea and a plea of nolo

contendere is that the latter gives the defendant the advantage of not being estopped from denying her fault in a civil action based upon the same facts." *People v. Darlington,* 105 P.3d 230, 233 (Colo.2005). The *Darlington* court cited *Young v. People,* 53 Colo. 251, 253, 125 P. 117, 118 (1912) (nolo contendere plea "gives the accused the advantage of not being estopped to deny his guilt in a civil action based upon the same facts").

The language in these cases suggests, at least by negative implication, that our supreme court would hold a guilty plea to be preclusive. However, because that issue was not decided, we turn to other jurisdictions for guidance.

### 2. Out–of–State Authority

Allen agrees that her guilty plea represents an admission, but asserts that we should follow the majority of jurisdictions, which in her view have held guilty pleas are not preclusive in subsequent civil litigation. She cites *Aetna Casualty & Surety Co. v. Niziolek,* 395 Mass. 737, 481 N.E.2d 1356, 1363 n. 6 (1985), as showing that thirty-nine states have resolved this issue in her favor.

Martin and Kutak respond that the "trend, particularly in the last ten years," shows the opposite conclusion, citing *Troville v. State,* 953 So.2d 637, 639–40 (Fla.Dist.Ct.App.2007); *Spircoff v. Stranski,* 301 Ill.App.3d 10, 234 Ill.Dec. 570, 703 N.E.2d 431, 435 (1998); *Diez v. Daigle,* 686 So.2d 966, 969 (La.Ct.App. 1996); *Butler v. Mooers,* 771 A.2d 1034, 1037 (Me.2001); *James v. Paul,* 49 S.W.3d 678, 686 (Mo.2001); *State v. Gonzalez,* 273 N.J.Super. 239, 641 A.2d 1060, 1061–62 (1994), *aff'd,* 142 N.J. 618, 667 A.2d 684 (1995); *Wloszek v. Weston, Hurd, Fallon, Paisley & Howley, LLP,* 2004 WL 64947 (Ohio Ct.App. No. 82412, Jan. 15, 2004) (unreported opinion); *Tillman v. Shofner,* 90 P.3d 582, 584 (Okla.Civ.App.2004); and *State Farm Fire & Casualty Co. v. Sallak,* 140 Or.App. 89, 914 P.2d 697, 700 (1996).

Based on our review of these cases, we perceive no sufficiently clear rule or recent trend to guide us because of anomalies such as the following:

- Many cases have treated guilty pleas as admissions, but not resolved preclusion. *See, e.g., Koch v. Elkins,* 71 Idaho 50, 225 P.2d 457, 460 (1950); *Abraham Lincoln Mem'l Hosp. Corp. v. Gordon,* 111 Ill. App.2d 179, 249 N.E.2d 311, 313 (1969); *Scogin v. Nugen,* 204 Kan. 568, 464 P.2d 166, 171 (1970); *Schaefer v. McCreary,* 216 Neb. 739, 345 N.W.2d 821, 825 (1984); *Pub. Serv. Co. v. Chancey,* 94 N.H. 259, 51 A.2d 845, 846 (1947); *Hazard v. Salles,* 222 Or. 559, 353 P.2d 548, 549 (1960); *Cromley v. Gardner,* 253 Pa.Super. 467, 385 A.2d 433, 436 (1978); *Ludwig v. Kowal,* 419 A.2d 297, 303 (R.I. 1980); *Lucas v. Burrows,* 499 S.W.2d 212, 214 (Tex.Civ.App.1973); *Russ v. Good,* 92 Vt. 202, 102 A. 481, 482 (1917); *Ryan v. Westgard,* 12 Wash.App. 500, 530 P.2d 687, 695 (1975); *Moore v. Skyline Cab, Inc.,* 134 W.Va. 121, 59 S.E.2d 437, 443–44 (1950); *Haley v. Dreesen,* 532 P.2d 399, 403 (Wyo.1975).

- Cases involving guilty pleas to traffic offenses are not helpful because defendants in such cases often have very little incentive to dispute the charges given the burdens of doing so. *See, e.g., Jacobs v. Goodspeed,* 180 Conn. 415, 429 A.2d 915, 917 (1980); *Thompson v. Hill,* 143 Ga.App. 272, 238 S.E.2d 271, 273 (1977); *Scogin v. Nugen,* 464 P.2d at 171; *Race v. Chappell,* 304 Ky. 788, 202 S.W.2d 626, 628 (1947); *Hutchins v. Westley,* 235 So.2d 434, 436 (La.Ct.App. 1970); *Jankowski v. Clausen,* 167 Minn. 437, 209 N.W. 317, 318 (1926); *Seals v. St. Regis Paper Co.,* 236 So.2d 388, 391 (Miss.1970); *Svejcara v. Whitman,* 82 N.M. 739, 487 P.2d 167, 168 (Ct.App. 1971); *Grant v. Shadrick,* 260 N.C. 674, 133 S.E.2d 457, 458–59 (1963); *Wilcox v. Gregory,* 112 Ohio App. 516, 176 N.E.2d 523, 525 (1960); *Berlin v. Berens,* 76 S.D. 429, 80 N.W.2d 79, 83 (1956); *see also* 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4474 ("It is common to recognize that conviction should not support issue preclusion if there was little incentive to defend vigorously, particularly if the prosecution was for a trivial offense."). *McCormick,* 539 F.Supp. 1179, is such a case.

- One line of cases involves government actions that proceeded directly from a criminal conviction or a guilty plea. *See, e.g., Troville v. State,* 953 So.2d at 639–40; *State v. Gonzalez,* 641 A.2d at 1061–62; *see also* 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4474 ("Perhaps the most attractive cases that have extended issue preclusion from criminal convictions to civil actions involve claims by the government for civil remedies based on the same transaction that gave rise to the conviction.... The same parties are involved in the same strategic positions.... The latter action is almost inevitably foreseeable at the time of the criminal trial.")(citing federal cases); *cf. People v. Goodwin,* 197 Colo. 47, 50, 593 P.2d 326, 328 (1979)(disapproving holding in prior case "that a judgment of conviction entered upon a plea of nolo contendere cannot be relied upon by the state for the imposition of statutory liabilities predicated solely on the fact of conviction").

- Another line of cases recognizes the unique equities of crime victims who seek to avoid the perpetrator's plea as a means of circumventing the "intentional act" limitation on the perpetrator's insurance coverage. *See, e.g., James v. Paul,* 49 S.W.3d at 682–84; *Prudential Prop. & Cas. Ins. Co. v. Kollar,* 243 N.J.Super. 150, 578 A.2d 1238, 1240–41 (1990); *State Farm Fire & Cas. Co. v. Sallak,* 914 P.2d at 700. However, a division of this court has taken the opposite view. *Colo. Farm Bureau Mut. Ins. Co. v. Snowbarger,* 934 P.2d 909, 911 (Colo.App.1997).

Because of these anomalies, we next consider the observation that "[u]ltimately, our determination depends not on the number of jurisdictions or authorities supporting a view, but rather on the persuasiveness of each position." *Mrozek v. Intra Fin. Corp.,* 281 Wis.2d 448, 699 N.W.2d 54, 63 (2005).

### 3. Policy Considerations

■■■ We weigh the policies favoring preclusion—the inequity of allowing a criminal defendant to reap the benefits of a guilty plea and then avoid its burdens by taking a contrary position in a civil proceeding, and resulting erosion of judicial integrity—against the possibility that events admitted by the plea in fact did not occur and the risk that imposing collateral consequences of guilty pleas in civil proceedings may discourage plea bargaining. Nothing in these policies or their application on the facts presented here persuades us to depart from language in Colorado cases which, as determined in *Jiron,* suggests treating a guilty plea as preclusive in subsequent civil litigation.

Courts holding that a guilty plea is preclusive in such litigation often adopt the rationale that "before a guilty plea is accepted, the [trial] court must ascertain that there is a factual basis for the plea." *Mrozek,* 699 N.W.2d at 62; *see Gonzalez,* 641 A.2d at 1062; *Wloszek,* 2004 WL 64947 (Ohio Ct.App. No. 82412, Jan. 15, 2004) (unreported opinion); *Sallak,* 914 P.2d at 700.

In Colorado, section 16–7–207(2)(f), C.R.S. 2007, and Crim. P. 11(b)(6) provide in pertinent part:

> The court shall not accept a plea of guilty ... without first determining ... [t]hat there is a factual basis for the plea. If the plea is entered as a result of a plea agreement, the court shall explain to the defendant and satisfy itself that the defendant understands the basis for the plea agreement, and the defendant may then waive the establishment of a factual basis for the particular charge to which he pleads guilty.

■■■ A guilty plea must represent "a voluntary and intelligent choice among the alternative courses of action open to the defendant," and must be the product of "a free and rational choice." *People v. Kyler,* 991 P.2d 810, 816 (Colo.1999) (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)). To ensure that a plea represents the defendant's "free and reasoned decision," the "court must consider 'all of the relevant circumstances surrounding [the entry of the plea].'" *Id.* at 817 (quoting *Brady v. United States,* 397 U.S. 742, 749, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)); *see* Crim. P. 11(b)(1)-(2).

Once the statutory and procedural requirements have been satisfied, a guilty plea "is the equivalent of admitting all material facts alleged in the charge." *People v. Flagg*, 18 P.3d 792, 794 (Colo.App.2000)(quoting *United States v. Powell*, 159 F.3d 500, 503 (10th Cir.1998)).

Here, at Allen's providency hearing, the court read the charges, she acknowledged her understanding of them and pled guilty, she confirmed that the plea was her "own free and voluntary decision," and she indicated that she did not "have any questions for the court or [her] lawyer." Thus, entry of her guilty plea complied with Crim. P. 11.

Further, Allen does not direct us to anything in the record, such as an affidavit opposing summary judgment, at odds with her admissions at the providency hearing. *Cf. Fed. Deposit Ins. Corp. v. Oldenburg*, 34 F.3d 1529, 1540 (10th Cir.1994) (guilty plea to a charge of willfully misapplying funds with intent to injure a savings and loan was inconclusive because before sentencing defendant told the court that he thought the transaction would benefit the savings and loan). And she has not sought to set aside her plea. Thus, because nothing about the particulars of the plea gives us pause, we turn to the systemic consequences of allowing a defendant who has pled guilty to adopt a contrary position in subsequent civil litigation.

In *Lobato v. Taylor*, 70 P.3d 1152, 1166 (Colo.2003), the supreme court noted that for purposes of res judicata, "if one matter could be easily relitigated with inconsistent results, judicial integrity would be compromised and the value of and respect for court rulings would be seriously devalued."

This observation is consistent with concerns expressed by courts in other jurisdictions about erosion of judicial integrity, if defendants who have pled guilty to criminal charges are allowed to take contrary positions in civil litigation on issues admitted in their pleas. *See Howarth v. State*, 925 P.2d 1330, 1334–35 (Alaska 1996) ("Allowing such a claim trivializes both the conviction and the criminal process."); *James*, 49 S.W.3d at 686 ("[O]ne equitable concern is whether the failure to give preclusive effect to a plea of guilty will permit the party who pleaded guilty to assert facts contrary to the plea of guilty, thereby permitting the criminal defendant to profit from her own fraud or wrongdoing."); *Gonzalez*, 641 A.2d at 1064 ("[O]ne who has pled guilty to the commission of a criminal offense may not, thereafter, seek in a different forum to deny commission of the very acts previously admitted.").

Despite such concerns, the court in *Mrozek v. Intra Financial Corp.*, declined to apply issue preclusion based on a guilty plea because:

[A guilty plea] represents the decision of the defendant "to forego such litigation and usually for reasons having little or nothing to do with the nature of the issues." ... The motives for the State and a criminal defendant to make a plea agreement are many. The State may be seeking to conserve its scarce resources by avoiding a trial and a defendant may be attempting to secure his freedom or at least a reduced term of incarceration. Such reasons have little or nothing to do with the determination of the issues in the [later action].

699 N.W.2d at 63 (quoting *Kollar*, 578 A.2d at 1240–41); *see also* 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4474.1 ("[T]he fear of preclusion denies the great benefits of plea bargaining to prosecution, defense, and the courts alike.").

Indeed, some cases "involve circumstances that plainly might lead a rational person to prefer the consequences of pleading guilty to the costs and uncertainties of enduring through trial," regardless of guilt or innocence. 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4474.1. In *State Farm Mutual Auto. Insurance Co. v. Worthington*, 405 F.2d 683 (8th Cir.1968), for example, the court limited the plea to an evidentiary admission because the plea rested on fear of adverse community sentiment, parole had been agreed to, and the defendant needed to be free to care for his children. *But see Plunkett v. Comm'r of Internal Revenue*, 465 F.2d 299, 306 (7th Cir.1972)(rejecting taxpayer's argument that his guilty plea to tax

fraud should not be considered preclusive in a later civil proceeding because of "the circumstances of the plea, such as coercion induced by his wife's indictment," which the government agreed to abandon as part of the plea agreement).

These considerations have some support in Colorado law. As in *Mrozek*, our supreme court has explained:

> A plea of nolo contendere also allows the parties to avoid the expense and delay of trial. [And] the defendant is able to avoid the notoriety and publicity of a trial, problems with lack of witnesses, limit the maximum penalty to which she would be exposed at trial, and avoid estoppel in a subsequent civil proceeding.

*Darlington*, 105 P.3d at 233.

■ Colorado appellate courts also recognize plea bargaining as a necessary component of the criminal law process, sanctioned by statute, court rule, and case law. *People v. Jasper*, 17 P.3d 807, 812 (Colo.2001)(" 'Plea bargaining' is an essential component of the administration of justice." (quoting *Santobello v. New York*, 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971))). Thus, "[t]he defendant should not be penalized for cooperating with the prosecution by engaging in an approved plea negotiation process which is consistent with the objectives of the criminal justice system." *People v. Garcia*, 169 P.3d 223, 227 (Colo.App.2007)(quoting *Gelfand v. People*, 196 Colo. 487, 491, 586 P.2d 1331, 1334 (1978)).

And as in *Worthington*, our supreme court has observed that externalities may drive an innocent defendant to plead guilty. *See Edison*, 100 Colo. at 577, 69 P.2d at 248 (defense counsel sensed "what they conceived to be a menacing prejudice in the community ... and convinced that notwithstanding respondent's innocence in fact, there was grave danger she would fare illy at the hands of a jury ... [and they] advised her to enter a plea of nolo contendere").

■ In our view, however, the availability of a nolo contendere plea significantly diminishes policy considerations disfavoring preclusion. Crim. P. 11(a) provides that "[a] defendant personally or by counsel may

plead guilty, not guilty ... or with the consent of the court, nolo contendere." Thus, an innocent defendant who desires to avoid the burdens and uncertainties of a criminal trial can plead nolo contendere, thereby avoid issue preclusion in collateral civil proceedings, and litigate fact issues encompassed by the charges in such a proceeding. *See Edison*, 100 Colo. at 578, 69 P.2d at 248 (attorney who pled nolo contendere in out-of-state proceeding not bound by plea in Colorado disbarment action because "the circumstances under which she was prompted to enter nolo contendere overcame any adverse implications which might otherwise attend such a plea"). Allowing defendants to plead nolo contendere also facilitates plea dispositions by conserving judicial resources that might otherwise be consumed by defendants who went to trial because they feared collateral civil consequences.

In sum, on the particular facts before us we conclude that Allen's guilty plea also meets the "actually litigated" factor for determining issue preclusion. However, we express no opinion on the preclusive effect of a guilty plea in subsequent civil litigation if the defendant had sought to avoid those consequences by entering a nolo contendere plea, but that option was foreclosed by either the prosecution or the trial court.

Accordingly, and for the reasons set forth in *Jiron*, we further conclude that Allen's guilty plea is preclusive for purposes of her claims against Kutak and Martin.

### B. Causation

Alternatively, Allen contends that even if her guilty plea is preclusive, the trial court erred in concluding as a matter of law that she could not prove Kutak and Martin caused her damages. We agree in part as to the breach of fiduciary duty claim, although we conclude that Allen cannot prove causation for other reasons as well.

■ To establish causation, a plaintiff must show that but for the attorney's conduct, the injury would not have occurred. *Brown v. Silvern*, 45 P.3d 749, 751 (Colo.App. 2001). In many such cases, causation requires the plaintiff to establish the "case

within a case"—that the underlying claim or defense would have succeeded had the attorney acted properly. *Id.; see also Rantz v. Kaufman,* 109 P.3d 132, 136 (Colo.2005) (requiring proof that had the attorney acted properly, the outcome in the underlying criminal proceeding would have been different).

■■■ Causation is usually a question of fact to be decided by the jury. *Brown,* 45 P.3d at 751. But if the facts are undisputed and reasonable minds could draw but one inference from them, causation becomes a question of law for the court. *Smith v. State Comp. Ins. Fund,* 749 P.2d 462, 464 (Colo. App.1987).

Kutak and Martin rely on cases holding that a plaintiff who has pled guilty to criminal charges cannot prove that mistaken legal advice concerning the underlying conduct caused damage. *See, e.g., Buttitta v. Newell,* 176 Ill.App.3d 880, 126 Ill.Dec. 330, 531 N.E.2d 957, 959–60 (1988); *Diez,* 686 So.2d at 969; *Butler,* 771 A.2d at 1037. However, other cases have recognized that in such a situation the attorney's advice could be but one of several causes. *See, e.g., State v. Therrien,* 175 Vt. 342, 830 A.2d 28, 35–36 (2003). In Colorado, damages from attorney misconduct can have multiple causes. *Brown,* 45 P.3d at 751–52.

Moreover, Allen's guilty plea to securities fraud did not establish willfulness as to the securities element. *See People v. Pahl,* 169 P.3d 169, 185 (Colo.App.2006)(willfulness does not require proof that defendant knew the transaction involved a security); *see also Destro,* — P.3d at —, 2008 WL 2202099, at *2 ("Proof of knowledge that an investment is a security is not required for a conviction of 'willful' securities fraud."). Hence, our causation analysis does not rely solely on the guilty plea.

### 1. Setting Aside a Criminal Conviction

Initially, we reject Allen's assertion that under *Rantz* and a companion case, *Smith v. Truman,* 115 P.3d 1279, 1280 (Colo.2005), her guilty plea cannot preclude her from proving causation against Kutak and Martin.

The *Rantz* court held that a criminal defendant who had been convicted could establish causation in a malpractice action against criminal defense counsel without first getting the conviction set aside on appeal or through collateral attack under Crim. P. 35(c). *Rantz,* 109 P.3d at 136; *see also Smith,* 115 P.3d at 1280 (criminal defendant's failure to seek postconviction relief was not a bar to bringing a legal malpractice action).

The supreme court framed the causation issue as whether criminal defendants would "be able to prove that the outcome of the criminal case would have been successful unless they prevail in some manner in appellate or postconviction proceedings." *Rantz,* 109 P.3d at 136. Here, as we understand Allen's position, the causation issue is whether "[t]he injury or damages, if any, proximately caused by the malpractice began when [Allen], acting on [Martin's] negligent advice, knowingly committed [her] crimes." *Butler,* 771 A.2d at 1039 (Alexander, J., dissenting).

Thus, unlike in *Rantz,* we are not dealing directly with the causal relationship between malpractice and the outcome of a criminal trial. *See Rantz,* 109 P.3d at 136 ("It may be that in some or even the majority of legal malpractice suits against criminal defense attorneys, their former clients will not be able to prove that the outcome of the criminal case would have been successful unless they prevail in some manner in appellate or postconviction proceedings."). Further, we do not place the same reliance on the guilty plea as did the trial court.

### 2. The Negligence Claim

Allen does not dispute that the participating buyer transactions on which she was indicted, including the added count to which she pled guilty, had all closed before Martin left Pendleton to join Kutak. Nevertheless, her opposition to Kutak's summary judgment motion relies on the following excerpts from summaries of anticipated testimony by her standard of care expert:

• Mr. Martin's negligent conduct continued when he moved to the Kutak firm and WIIN followed him. While at the Kutak firm he took no action to mitigate the

risks facing the WIIN principals. [Initial disclosure.]

- When Mr. Martin moved to the Kutak firm, he was well aware of the problems occurring with the Participating Buyers and it was still approximate[ly] one year prior to Ms. Allen's indictment. Had he acted quickly he would have greatly mitigated the situation Ms. Allen found herself in [when she was indicted on securities fraud] one year later. In short, it was not too late when Mr. Martin moved to Kutak to take care of past securities problems and to advise WIIN of such options.... [This] objective could have been accomplished by generating documents to contact prior participating buyers and offering to rescind the transactions once full disclosure was made.... "These failures fall below the standard of care." [Supplemental disclosure.]

■■■ Even assuming that the summaries constitute the expert's report rather than merely draftsmanship of counsel, an unsworn expert's report does not create a genuine issue of material fact sufficient to defeat summary judgment. *McDaniels v. Laub*, 186 P.3d 86, 87 (Colo.App.2008). However, we cannot end our analysis on this basis because in a pretrial evidentiary hearing, the expert testified that the summaries reflected his opinions.

■■■ Accepting this expert testimony requires us to analyze causation assuming that while at Kutak Martin had advised WIIN to offer participating buyers rescission before the securities fraud indictment and that WIIN had done so with proper disclosures. Nevertheless, to avoid summary judgment on her negligence claim as to the securities fraud charges, Allen would still have had to establish a disputed fact issue whether she would not have been indicted or her damages would have been less because she would not have pled guilty and would have been acquitted at trial. We discern no such factual issue, for two reasons.

■■■ First, because the participating buyer transactions in the indictment and guilty plea predated Martin's joining Kutak, the alleged securities fraud had already oc-

curred. In general, criminal defendants cannot defend charges based on a completed crime by later conduct that seeks to undo that crime. *See, e.g., People v. Pedrie*, 727 P.2d 859, 863 (Colo.1986)(return of stolen funds); *Hucal v. People*, 176 Colo. 529, 534–35, 493 P.2d 23, 26 (1971) (same).

Second, although a proper rescission offer is a defense to a civil damages action under section 11–51–604(9), C.R.S.2007, no comparable defense appears in section 11–51–603, C.R.S.2007, which establishes a criminal penalty for violation of section 11–51–501, C.R.S. 2007. Nor is such a defense mentioned in section 11–51–501 itself. *Cf. People v. White*, 819 P.2d 1096, 1098 (Colo.App.1991) (mention of one exception excludes other exceptions).

Therefore, Martin's failure to advise WIIN to make all participating buyers rescission offers could not have caused Allen's damages from the indictment and her guilty plea.

Moreover, even if such offers might, as a matter of prosecutorial discretion, somehow alter the consequences of a completed crime, this theory is foreclosed by our affirming the trial court's decision to strike Allen's criminal law expert, as discussed in subsection 4 below.

We are not persuaded that the Ryan transaction, which Allen raised as part of her negligence claim because noncompliance with securities laws allegedly led to prosecution of the Ryan charges, precludes summary judgment on the negligence claim. Unlike the participating buyer transactions, the Ryan transaction closed while Martin was at Kutak, and he performed legal services in connection with it, the nature of which is disputed. Regardless, neither the amended complaint nor the summaries of the standard of care expert's anticipated testimony explain how Martin mishandled this transaction. The summaries say only, "It was the failure to comply with the securities laws and provide the necessary disclosure that exposed Ms. Allen to securities charges. This then led to the Ryan charges."

Even if we accept this conclusory opinion for purposes of summary judgment, Allen's proximate cause theory is much more attenuated than her theory on the securities fraud

charges. The Ryan transaction did not involve a participating buyer, and thus was not subject to the allegedly inadequate advice from Pendleton concerning securities law. Unlike Allen's theory that Martin could have precluded the securities fraud indictment by offering rescission, her standard of care expert suggests no remedial strategy that Martin should have employed to avoid the theft indictment stemming from the Ryan transaction. Moreover, we have concluded that C.R.C.P. 13(a) precludes any claim against Martin for conduct while he was at Pendleton, and we have rejected the rescission theory as a defense to criminal securities charges.

■■■ Unlike our conclusion as to the limited effect of her guilty plea to securities fraud in light of *Pahl* and *Destro*, her guilty plea in the Ryan transaction established her intent as to *all* elements of that offense. *See* § 18–4–401(1)(a)–(b), C.R.S.2007 ("A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception. . . .").

Further, in a civil damages action against Allen arising from the Ryan transaction, she stipulated "to the facts forming the basis of Plaintiff's First Claim for Relief (Fraud/False representation), [and] Plaintiff's Second Claim for Relief (Fraud/Nondisclosure)." The court's order entering judgment against Allen recites:

> Based upon Defendant Allen's own admissions, Defendant Allen committed the fraudulent and negligent acts described more fully in Plaintiff's Complaint. As a direct result of Defendant Allen's fraudulent and negligent acts, Plaintiff suffered damages.

The criminal offense, as described in both the indictment and the Ryan plea, involves the same fraud and nondisclosure alleged in the civil action. Allen does not dispute that her stipulation and the resulting judgment in the Ryan civil action are preclusive in this case.

Hence, even if the theory that securities problems arising from the participating buyers program "led to" the Ryan charges were not foreclosed by our earlier conclusions concerning C.R.C.P. 13(a) and the rescission defense, we also conclude that the guilty plea

*and* the Ryan civil judgment preclude Allen from proving that Martin's acts or omissions concerning those securities problems caused her injuries resulting from the later indictment on, and guilty plea in connection with, the Ryan transaction. *See Diez*, 686 So.2d at 969; *Butler*, 771 A.2d at 1037.

Therefore, we further conclude that summary judgment in favor of Kutak and Martin was proper on Allen's negligence claim.

### 3. The Breach of Fiduciary Duty Claim

As against Kutak, this claim is based on Martin's conduct after he joined Kutak, primarily his ongoing failure to acknowledge to the prosecutor his earlier advice to Allen and WIIN allegedly blessing the participating buyers program.

Breach of fiduciary duty arising from the attorney-client relationship requires expert testimony. *Ehrlich Feedlot, Inc. v. Oldenburg*, 140 P.3d 265, 271 (Colo.App.2006); *Aller v. Law Office of Carole C. Schriefer, P.C.*, 140 P.3d 23, 28 (Colo.App.2005).

■■■ "[R]eliance on advice of counsel is not an absolute defense to the above [fraud] charges, but rather merely a factor for the jury to consider." *People v. Terranova*, 38 Colo.App. 476, 481, 563 P.2d 363, 366 (1976); *see also People v. Hoover*, 165 P.3d 784, 792 (Colo.App.2006)(citing *Terranova* with approval, but determining that the issue had not been preserved).

In her opposition to Kutak's summary judgment motion, Allen relied on Martin's deposition testimony that he did not "offer [the WIIN principals] any assistance in their criminal cases" or even "call them to discuss their criminal cases." According to Allen, a reasonable juror might conclude that had Martin come forward, the prosecutor would have dropped the charges, reduced them, or accepted a plea more favorable to her. For this theory to survive summary judgment, however, the record would have to include expert testimony that Martin's fiduciary duty required him to do so. Allen's standard of care expert did not address this point.

Insofar as the Ryan transaction is involved, Allen's standard of care expert did

not opine that by failing to go to the prosecutor Martin breached a fiduciary duty concerning this transaction. Rather, as discussed above, he limited his opinion to steps that he asserts Martin should have taken, after he joined Kutak and before Allen was indicted, to mitigate WIIN's securities problems, which purportedly "led to the Ryan charges."

■ Although not resolved in Colorado, most jurisdictions have concluded that causation in a legal malpractice action must be proved by expert testimony, unless causation is within the jury's common understanding. *See, e.g., Samuel v. Hepworth, Nungester & Lezamiz, Inc.,* 134 Idaho 84, 996 P.2d 303, 308 (2000); *Singh v. Krueger,* 39 Kan.App.2d 637, 183 P.3d 1, 4 (2008); *McElroy v. Robinson & Cole LLP,* 61 Mass.App.Ct. 1110, 809 N.E.2d 1100 (2004) (unpublished opinion); *F.W. Indus., Inc. v. McKeehan,* 198 S.W.3d 217, 221 (Tex.App.2005); *Meyer v. Mulligan,* 889 P.2d 509, 516 (Wyo.1995)(reason for requiring expert testimony concerning proximate cause is that "lay people are not competent to pass judgment on legal questions" (quoting *Moore v. Lubnau,* 855 P.2d 1245, 1249 (Wyo.1993))); *see also Beecher v. Greaves,* 73 Conn.App. 561, 808 A.2d 1143, 1145–46 (2002) (failure of client's expert witness to testify on causation was fatal to client's legal malpractice claims).

We consider these cases to be well reasoned and consistent with Colorado precedent. *See Boigegrain v. Gilbert,* 784 P.2d 849, 850 (Colo.App.1989)(drawing analogy from medical malpractice case as to need for expert testimony in legal malpractice case); *Conrad v. Imatani,* 724 P.2d 89, 94 (Colo.App.1986)(negligent misrepresentation and breach of express warranty claims in medical malpractice action required expert testimony to prove causation).

On the facts presented, we decline to follow the minority view, which assumes that in the "trial within a trial" phase, "[t]he plaintiff must present virtually the same evidence that would have been presented in the underlying action." *Whitley v. Chamouris,* 265 Va. 9, 574 S.E.2d 251, 252 (2003); *see also Cook v. Cont'l Cas. Co.,* 180 Wis.2d 237, 509 N.W.2d 100, 105 (App.1993). Here, in contrast to a civil action that was tried but might have come out differently but for alleged malpractice, because Allen's guilty plea avoided a trial, her evidence could show only how the prosecutor *might* have exercised his discretion otherwise.

■ Thus, we conclude that here expert testimony was also required on damages supposedly caused by the breach of fiduciary duty. The question of what effect, if any, Martin's coming forward would have had on the criminal proceedings is far from "clear and palpable." *Boigegrain,* 784 P.2d at 850. The standard of care expert did not opine on how the criminal case would have proceeded differently had Martin talked to the prosecutor, a subject beyond the experience of the jurors. *See Meyer,* 889 P.2d at 516.

Therefore, we turn to the trial court's order, before it ruled on summary judgment, striking the criminal law expert, whose opinion summary both addressed Martin's failure to talk to the prosecutor as a breach of fiduciary duty and explained how the criminal case would have proceeded differently had he done so.

### 4. The Criminal Law Expert

■ A trial court has "broad discretion to determine the admissibility of expert testimony, and the exercise of that discretion will not be overturned unless manifestly erroneous." *People v. Ramirez,* 155 P.3d 371, 380 (Colo.2007). Ruling on an expert's qualifications is a preliminary question for the trial court. *People v. Williams,* 790 P.2d 796, 800 (Colo.1990). An expert's lack of qualifications is a matter of admissibility, not of weight. *Meier v. McCoy,* 119 P.3d 519, 522 (Colo.App.2004). And even if a proposed expert is qualified, the testimony may be rejected for lack of a sufficient factual basis. *People v. Lanari,* 926 P.2d 116, 121–22 (Colo. App.1996).

■ "A trial court may accept an attorney as an expert witness when his 'knowledge, skill, expertise, training, or education' so qualifies him." *Southerland v. Argonaut Ins. Co.,* 794 P.2d 1102, 1106 (Colo.App.1990) (quoting CRE 702). Such opinions can be the basis for denying summary judgment.

*White v. Jungbauer,* 128 P.3d 263, 266 (Colo. App.2005)

As particularly relevant to Allen's breach of fiduciary duty claim, the criminal law expert's testimonial summary included the following:

- Mr. Martin makes it clear that he offered no assistance to Ms. Allen in her criminal case. If Mr. Martin had gone to the Prosecutor or Ms. Allen's defense attorney and explained his role and that he gave a "stamp of approval" to the WIIN transactions it would have made a huge difference. . . . Instead, Mr. Martin remains [sic] silent in breach of his fiduciary duty and in violation of his duty of loyalty.
- But for the securities charges, there would not have been any theft charges.
- Mr. Martin . . . was involved in all of the [Ryan] loan transactions . . . and his observations that there was no intent to deprive Mr. Ryan of his funds permanently would have been hugely important to Ms. Allen.
- If Mr. Martin had stepped forward it is likely that if the charges were not completely dropped that the plea offer would have been greatly reduced.

■■■ The trial court struck the expert because "under [CRE] 702, [his anticipated testimony] has either no factual basis or is not reliable or is not expert opinion at all or is based purely on speculation." In support of this ruling, the court found that because the expert "has no expertise whatsoever with a securities fraud case," he was not competent to testify "what a district attorney ought to have done or would have done with the securities case"; that "there is no way for [the expert] to be able to testify to a reasonable degree of legal certainty or probability what effect [Martin's] coming forward would have had"; and that the expert "can only speculate about what any particular prosecutor would have done under any particular set of circumstances."

We discern no manifest error in the trial court's exercise of its discretion. At the hearing, Allen presented testimony from her standard of care expert but not from her criminal law expert. However, the court had before it the criminal law expert's entire deposition transcript, which showed that the expert had never prosecuted or defended a securities fraud case, nor had he advised a client on securities issues. He had not done any legal research on securities law in at least twenty years and did not understand the "investment contract" definition of a security, which was the theory underlying the participating buyers program criminal charges. *See Destro,* —— P.3d at ——, 2008 WL 2202099, at *6. This lack of background adequately supports the holding that the expert had no factual basis for opining that had Martin disclosed his legal advice concerning the participating buyers program and his observations of the Ryan transaction, in the hands of a reasonable prosecutor the criminal case would have proceeded differently.

We are not persuaded otherwise by Allen's argument that our review should be de novo because the trial court purportedly misapplied the controlling legal standards under CRE 702 in failing to address whether the testimony would be helpful to the jury or its prejudicial effect would be outweighed by its probative value. This assertion ignores "[t]he trial court's gatekeeping function [to assure] that specialized testimony is reliable, relevant, and helpful to the jury." *People v. Prieto,* 124 P.3d 842, 849 (Colo.App.2005). Only reliable expert testimony can be helpful to the jury. *Masters v. People,* 58 P.3d 979, 994 (Colo.2002). While experienced-based testimony may invoke different reliability considerations than scientific testimony, the court must still determine "whether the witness is qualified to render an expert opinion." *Meier,* 119 P.3d at 521. Here, once the court determined the testimony to be unreliable because the expert was not qualified, it had no reason to weigh prejudicial effect against probative value.

Although the court did not analyze the expert's opinion that Martin had breached a fiduciary duty by not coming forward, it clearly rejected his opinion as to the consequences of this failure to act. We need not address the breach of fiduciary duty opinion because even assuming that the criminal law expert could testify to such a breach, without

the additional opinion of this expert as to its consequences Allen could not avoid summary judgment on causation.

Therefore, we further conclude that summary judgment was proper on the breach of fiduciary duty claim against Kutak and Martin for lack of expert testimony.

The judgment is affirmed.

Judge DAILEY and Judge ROMÁN concur.